**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JAMES F. PARKER**, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **LEIDOS, INC.** and **DILIGENT CORPORATION**, <br><br> Defendants. | NO. 23-11070 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

James F. Parker ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Leidos, Inc. ("Leidos") and Diligent Corporation ("Diligent") (collectively, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

**NATURE OF ACTION**

1.       This class action arises from Defendants' failures to protect highly sensitive personal information and data, including Personally Identifying Information[1] ("PII"), of its current and former employees, including Plaintiff and the proposed Class Members.

---

[11] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

2.     Diligent Corporation sells software in the areas of "governance, risk, compliance, audit and ESG."[2] Diligent boasts that "[o]ne million users and more than 700,000 board members and leaders rely on Diligent software."[3]

3.     Leidos is an international corporation with business in the "civil, defense, health, and intelligence" sectors.[4] Leidos boasts that it is "listed No. 274 on the Fortune 500" and that it "work[s] with a broad range of public- and private-sector clients in the U.S. and internationally."[5]

4.     Leidos was (and/or is) a client of Diligent.

5.     As part of its business, Leidos collects and stores a litany of highly sensitive PII about its current and former employees, Plaintiff and the proposed Class Members. And Leidos used Diligent's software to store this PII.

6.     But Leidos lost control over that data when cybercriminals infiltrated Diligent's insufficiently protected computer systems in a series of data breaches (together, the "Data Breach").[6]

7.     It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to current and former employees' PII.

8.     On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train its employees on cybersecurity and failed to maintain

---

[2] *About Us*, DILIGENT, https://www.diligent.com/company/about-us (last accessed Oct. 5, 2023).
[3] *Id.*
[4] *Our Business*, LEIDOS, https://www.leidos.com/company/our-business (last accessed Oct. 4, 2023).
[5] *Id.*
[6] *See* Notice of Data Breach, DEPT JUST. MONTANA (June 9, 2023) https://dojmt.gov/wp-content/uploads/Consumer-notification-letter-345.pdf, **attached as Exhibit A.**

reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

9.    Plaintiff is a Data Breach victim, having received a breach notice. He brings this class action on behalf of himself, and all others harmed by Defendants' misconduct.

10.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, Plaintiff and the Class's private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

11.    Plaintiff, James F. Parker, is natural person, U.S. citizen, and citizen of California (where he is domiciled and maintains a residence). Currently, he is living and working in South Korea temporarily. Plaintiff always intended—and still intends—to return to his domicile in California.

12.    Defendant, Leidos, Inc., is a Stock Corporation incorporated in Delaware and with its principal place of business at 1750 Presidents Street, Reston, Virginia 20190.

13.    Defendant, Diligent Corporation, is a Corporation incorporated in Delaware, and with its principal place of business at 111 West 33rd Street 16th Floor, New York, New York 10001.

**JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff (as a California citizen) and Defendants are citizens of different states. And there are over 100 putative Class members.

15.     This Court has personal jurisdiction over Leidos because it regularly conducts business in New York and has sufficient minimum contacts in New York.

16.     This Court has personal jurisdiction over Diligent because it is headquartered in New York, regularly conducts business in New York, and has sufficient minimum contacts in New York.

17.     Venue is proper in this Court because Diligent's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

*Leidos Collected and Stored the PII of Plaintiff and the Class*

18.     Leidos is an international corporation with business in the "civil, defense, health, and intelligence" sectors.[7] Leidos boasts that it is "listed No. 274 on the Fortune 500" and that it "work[s] with a broad range of public- and private-sector clients in the U.S. and internationally."[8]

19.     As part of its business, Leidos receives and maintains the PII of thousands of its current and former employees.

20.     In collecting and maintaining the PII, Leidos agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

21.     Under state and federal law, businesses like Leidos have duties to protect its current and former employees' PII and to notify them about breaches.

22.     Leidos recognizes these duties. In its "Privacy Statement," Leidos promises that:

---

[7] *Our Business*, LEIDOS, https://www.leidos.com/company/our-business (last accessed Oct. 4, 2023).
[8] *Id.*

a.   "Leidos, Inc. . . . recognizes the importance of protecting your Personal Information."[9]

b.   "We commit to collecting and processing your Personal Information responsibly and in compliance with applicable data protection/privacy laws."[10]

c.   "Leidos policy requires limiting the collection and storage of personal information only to what is required for a legitimate business purpose."[11]

d.   "The integrity, availability and confidentiality of your Personal Information matters to us."[12]

e.   "[W]e use industry-standard technical, administrative and physical controls to protect Personal Information from unauthorized access, use and disclosure."[13]

f.   "We also review and evaluate our security procedures and controls on an ongoing basis to consider appropriate new technology and updated methods to help minimize risks from new security threats as they become known."

23.   Furthermore, Leidos references a "Global Employee Privacy Notice" which "applies to any employment-related information" about "Leidos employee[s]."[14] Upon information and belief, this "Global Employee Privacy Notice" remains within Leidoss' custody and control.

---

[9] *Privacy Statement*, LEIDOS (April 2023) https://www.leidos.com/privacy#current.
[10] *Id*.
[11] *Id*.
[12] *Id*.
[13] *Id*.
[14] *Id*.

24.     Elsewhere, Leidos declares the following:

a.      "We have a *duty to our employees*, customers, communities, and stakeholders to proactively safeguard and handle their data, systems, and technology in line with the continually-developing regulatory framework across the globe."[15]

b.      "We apply industry-leading data privacy and cybersecurity standards in our day-to-day business."[16]

c.      "Protecting personal information is a commitment we make to our customers *and employees* and is an essential part of doing business."[17]

25.     Moreover, via its "Approach to Data Privacy," Leidos promises the following:

a.      "We know that improperly handling personal information can have serious consequences for our employees[.]"[18]

b.      "As stated in our Code of Conduct, keeping data secure is a key part of demonstrating the commitment of Leidos . . . to each other."[19]

c.      "[W]e don't provide data to third parties other than for the purpose of completing transactions, obtaining and providing services and as per the terms of our customer contracts."[20]

26.     And in its "Privacy Notice for Leidos Job Applicants," Leidos promises that:

---

[15] *Trust Center*, LEIDOS, https://www.leidos.com/company/trust (last accessed Oct. 4, 2023) (emphasis added).

[16] *Id.*

[17] *Id.* (emphasis added).

[18] *Approach to Data Privacy*, LEIDOS, https://www.leidos.com/company/trust/data-privacy (last accessed Oct. 4, 2023).

[19] *Id.*

[20] *Id.*

a.  "Leidos will not share your Personal Information with third parties[.]"[21]

b.  "The security and protection of your Personal Information is a serious matter."[22]

c.  "Leidos has reasonable and appropriate policies and controls to protect Personal Information from . . . misuse or unauthorized disclosure."[23]

27.  Finally, in the employee section of it "Code of Conduct," Leidos promises that:

a.  "We Protect Privacy and Confidentiality."[24]

b.  "We comply with applicable (i) data privacy and data protection laws, rules, and regulations as well as (ii) Leidos internal and public-facing privacy statements, notices, policies and procedures. We also adhere to applicable privacy and data protection related contractual obligation."[25]

c.  "Personal Information may only be transferred to or shared with approved third parties."[26]

d.  "Such sharing is subject to (i) Leidos privacy policies and notices, including our Data Privacy policy, (ii) applicable laws, regulations and industry standards, and (iii) applicable contractual obligations. You must read and understand our Data Privacy policy, the Leidos public-facing Privacy

---

[21] *Privacy Notice for Leidos Job Applicants*, LEIDOS, https://leidos.widen.net/s/dq5lrtfxds/pdf-leidos-careers-applicants-privacy-notice (last accessed Oct. 4, 2023).
[22] *Id.*
[23] *Id*.
[24] *Our Leidos Code of Conduct*, LEIDOS, https://content.learn.saiglobal.com/GLE/Clients/LDS/Courses/GLE/_Asset_Library/gle/docs/LDS_eng_Code.pdf (last accessed Oct. 4, 2023).
[25] *Id*.
[26] *Id*.

Statement and all applicable contractual obligations prior to collecting, transferring or sharing Personal Information."[27]

***Diligent Collected and Stored the PII of Plaintiff and the Class***

28.    Diligent is an international corporation that sells software in the areas of "governance, risk, compliance, audit and ESG."[28] Diligent boasts that "[o]ne million users and more than 700,000 board members and leaders rely on Diligent software."[29]

29.    As part of its business, Diligent receives and maintains the PII of thousands of Leidos' current and former employees.

30.    In collecting and maintaining the PII, Diligent agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

31.    Under state and federal law, businesses like Diligent have duties to protect the PII within its care and to notify the PII holders about breaches.

32.    Diligent recognizes these duties. For example, Diligent promises that:

    a.    "Ensuring your data is protected is critical to Diligent."[30]

    b.    "We prioritize your privacy by providing clear information about your rights and facilitating their exercise. You're in control, with the option to manage your preferences and the extent of information shared with us and our partners."[31]

---

[27] *Id*.

[28] *About Us*, DILIGENT, https://www.diligent.com/company/about-us (last accessed Oct. 5, 2023).

[29] *Id*.

[30] *Vulnerability Disclosure Program*, DILIGENT, https://www.diligent.com/vulnerability-disclosure-program (last accessed Oct. 5, 2023).

[31] *Id*.

c.    "Every person, team, and organization using Diligent applications and services expects their data to be secure, available, and handled according to strict confidentiality and privacy principles at all times — and we understand how important this is."[32]

d.    "We regularly assess risk, monitor our controls, evaluate potential threats, and use this information to update our controls framework from policies and procedures to encryption protocols."[33]

e.    "Our system control environment is designed to provide confidentiality, availability, and integrity for our SaaS offerings. . . . These controls and supporting policies provide us and our customers with operational assurance."[34]

f.    "PII is isolated and protected in the system and that each customer has access to its data only."[35]

g.    "Our security program is founded on the controls we have built into our service to protect customer data."[36]

33.    Similarly, Diligent makes the following promises in its Privacy Policy:

a.    "We implement technical and organizational measures to ensure . . . the ongoing integrity and confidentiality of personal information."[37]

---

[32] *Trust Center*, DILIGENT, https://www.diligent.com/trust (last accessed Oct. 5, 2023).
[33] *Id*.
[34] *Id*
[35] *Id*.
[36] *Data Protection*, DILIGENT, https://www.diligent.com/trust/privacy-and-data/ (last accessed Oct. 5, 2023).
[37] *Privacy Policy*¸ DILIGENT, https://www.diligent.com/legal/privacy (last accessed Oct. 5, 2023).

b.      "Where we collect personal information from third party sources and do not have a relationship with you, we will keep your personal information for a period of time that is consistent with the reason for which we collected it."[38]

c.      "We will delete your personal information when it is no longer required."[39]

d.      "We have put in place appropriate safeguards (such as contractual commitments) in accordance with applicable legal requirements to ensure that your personal information is adequately protected."[40]

34.    Moreover, Diligent itself recognizes that:

a.      "With the increase of hacking activity around the world, user data has become more valuable and is become a viable form of currency for hackers."[41]

b.      "Companies can and should do better to protect their sensitive data."[42]

***Defendants' Data Breach***

35.    On or around September 30, 2022, cybercriminals hacked Leidos' chosen provider of enterprise case management systems, Diligent Corp.[43]  By November 11, 2022, Leidos learned that "an unauthorized individual was able to exploit a vulnerability in [the] platform to download documents from the system."[44]

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Cloud Storage Hack*, DILIGENT (Jan. 12, 2017) https://www.diligent.com/en-gb/blog/4-reasons-why-some-cloud-storage-solutions-are-not-secure/.
[42] *Id.*
[43] *Notice of Data Breach*, DEPT JUST. MONTANA (June 9, 2023) https://dojmt.gov/wp-content/uploads/Consumer-notification-letter-345.pdf, Exhibit A.
[44] *Id.*

36.     Then again, "as early as October 1, 2022," "an unauthorized person was able to exploit a second vulnerability in [the] platform to view the information submitted by individuals to Leidos." [45] By February 9, 2023, Leidos was notified of this additional hacking.[46]

37.     Because of Defendants' Data Breach, at least the following types of PII of Plaintiff and the proposed Class Members were compromised:

      a.    names; and

      b.    Social Security numbers.

38.     Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendants' custody and control. And upon information and belief, the putative class is over one hundred members—as it includes current and former employees.

39.     And yet, Leidos waited until June 9, 2023—a full *four months* after it learned of the October 2022 data breach—before it began notifying the class.

40.     Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

41.     And when Leidos did notify Plaintiff and the Class of the Data Breach, Leidos acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class to:

      a.    "[C]arefully review the Additional Resources appendix to this letter, as it contains information about the steps you can take to protect yourself against fraud and identity theft."[47]

---

[45] *Id.* (emphasis added).
[46] *Id.*
[47] *Id.*

b.    "[R]emain vigilant by reviewing your account statements, credit reports, and explanation of benefits for unauthorized activity."[48]

c.    "[C]ontact your local law enforcement representative, your state attorney general, and/or the Federal Trade Commission."[49]

d.    "[L]earn more about protecting yourself from identity theft and fraud, including how to request that a fraud alert or security freeze be placed on your credit report, from the Federal Trade Commission at http://www.ftc.gov/idtheft."[50]

e.    "[C]heck the website for your state's attorney general for more information on how to protect yourself and your information."[51]

42.    Defendants failed to comply with their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

43.    Since the breach, Leidos claims that it "[is] examining our processes around our use of the ECMS . . . [and] is currently requiring all new reports to be submitted directly to Leidos and has instructed all Leidos employees with access to the ECMS to refrain from uploading any new documents."[52]

44.    But this is too little too late. Simply put, these measures—which Leidos now recognizes as necessary—should have been implemented *before* the Data Breach.

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

45.     On information and belief, Defendants failed to adequately train their employees on reasonable cybersecurity protocols or implement reasonable security measures.

46.     Further, the Notice of Data Breach shows that Defendants cannot—or will not—determine the full scope of the Data Breach, as Defendants has been unable to determine precisely what information was stolen and when.

47.     Defendants have done little to remedy their Data Breach. True, Leidos has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Defendants inflicted upon them.

48.     Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

49.     Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully "download[ed] documents."[53]

50.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[54]

51.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

---

[53] *Id.*

[54] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

*Plaintiff's Experiences and Injuries*

52.     Plaintiff James F. Parker is a former employee of Leidos, having worked for Leidos from approximately September 7, 2022 to November 18, 2022.

53.     Thus, Leidos obtained Plaintiff's PII, maintained it, and disclosed it to Diligent. And as a result, Plaintiff's PII was unauthorizedly disclosed in, and Plaintiff was injured by, the Data Breach.

54.     As a condition of his employment with Leidos, Plaintiff provided Leidos with his PII. Leidos used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

55.     Plaintiff provided his PII to Leidos and trusted the company would use reasonable measures to protect it according to Leidos' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

56.     Plaintiff received a Notice of Data Breach via mail on August 12, 2023.[55]

57.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

58.     Through their Data Breach, Defendants compromised Plaintiff's name, and other personal information.[56]

59.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in their breach notice.

---

[55] *See* Leidos, Notice of Data Breach, July 18, 2023, **attached as Exhibit B.**
[56] *Id.*

60.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

61.     Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

62.     Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

63.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

64.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

65.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

66.     Moreover, Plaintiff has already suffered from substantial identity theft and fraud as a result of the Data Breach which Defendants permitted to occur.

67.     In early February 2023—a few months after the Data Breach—Plaintiff suffered from a fraudulent charge on his bank account of $390.30.

68.     In response to this fraudulent charge, Plaintiff's bank locked his account. As such, Plaintiff was forced to close his account, and then begin the lengthy process of opening another account (with the same bank).

69.     Due to the closing of his bank account—and the difficulties with opening a new account—Plaintiff was unable to send money electronically (e.g., by credit or debit card) and thus could not (and/or struggled to) pay monthly bills, subscriptions, cell phone costs, school programs, and food.

70.     As a result, Plaintiff (and his family) were cut off from various online services. And Plaintiff's children were removed from their typical after school programs because the programs only accepted payment by credit or debit card.

71.     Furthermore, due to the closing of his bank account, Plaintiff was forced to travel extensively—to try and pay various bills in-person and with cash.

72.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

73.     Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, fraudulent charges, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

      a.     loss of the opportunity to control how their PII is used;

      b.     diminution in value of their PII;

      c.     compromise and continuing publication of their PII;

      d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      unauthorized use of their stolen PII; and

h.      continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fail to take appropriate measures to protect the PII.

74.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

75.     The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

76.     It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

77.     One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

78.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

79.     In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

80.     Defendants disclosed the PII of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

81.     Defendants' failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

82.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

83.     In 2021, a record 1,862 data breaches occurred, exposing approximately

293,927,708 sensitive records—a 68% increase from 2020.[57]

84.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[58]

85.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Defendants Failed to Follow FTC Guidelines***

86.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

87.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[59]  The FTC declared that, *inter alia*, businesses must:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

---

[57] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

[58] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[59] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

      c.      encrypt information stored on computer networks;

      d.      understand their network's vulnerabilities; and

      e.      implement policies to correct security problems.

88. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

89. Furthermore, the FTC explains that companies must:

      a.      not maintain information longer than is needed to authorize a transaction;

      b.      limit access to sensitive data;

      c.      require complex passwords to be used on networks;

      d.      use industry-tested methods for security;

      e.      monitor for suspicious activity on the network; and

      f.      verify that third-party service providers use reasonable security measures.

90. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

91. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to Leidos' current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

92.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

93.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

94.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

96.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals domiciled in the United States whose PII was compromised in the Data Breach, including all individuals who received notice of the breach (the "Nationwide Class").

97.     Plaintiff also proposes the following subclass, to be represented by Plaintiff James F. Parker:

> All individuals domiciled in California whose PII was compromised in the Data Breach, including all individuals who received notice of the breach (the "California Subclass").

Together, the Nationwide Class and the California Subclass are referred to as the "Class."

98.     Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors or assigns, and any Judge who adjudicates this case, including their staff and immediate family.

99.     Plaintiff reserves the right to amend the class definition.

100.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

101.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

102.    <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least one hundred members.

103.    <u>Typicality</u>. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

104.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. his interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

105.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a.    if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendants were negligent in maintaining, protecting, and securing PII;

d.    if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e.    if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendants' Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

106. <u>Superiority.</u> A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**<u>FIRST CAUSE OF ACTION</u>**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

107. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

108. Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

109. Defendants owed a duty of care to Plaintiff and Class members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

110.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

111.    Defendants owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class members' PII.

112.    Defendants owed—to Plaintiff and Class members—at least the following duties to:

a.    exercise reasonable care in handling and using the PII in their care and custody;

b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

113.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

114.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

115.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

116.    Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendants.

117.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

118.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

119.    Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

120.    Defendants breached these duties as evidenced by the Data Breach.

121.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

        a.    disclosing and providing access to this information to third parties and

b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in they employ who were responsible for making that happen.

122.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

123.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

124.    Defendants have admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

125.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

126.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

127.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted

from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing,

imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

128.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

129.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate

computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

130.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce,"

including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as

Defendants, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of

Defendants' duty to protect Plaintiff and the Class members' sensitive PII.

131.    Defendants breached their respective duties to Plaintiff and Class members under

the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security

practices to safeguard PII.

132.    Defendants violated their duty under Section 5 of the FTC Act by failing to use

reasonable measures to protect PII and not complying with applicable industry standards as

described in detail herein. Defendants' conduct was particularly unreasonable given the nature and

amount of PII Defendants had collected and stored and the foreseeable consequences of a data

breach, including, specifically, the immense damages that would result to individuals in the event

of a breach, which ultimately came to pass.

133.    The harm that has occurred is the type of harm the FTC Act is intended to guard

against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

134.    But for Defendants' wrongful and negligent breach of the duties owed, Plaintiff and Class members would not have been injured.

135.    The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that Data Breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

136.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

137.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

138.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

139.    Plaintiff and Class members directly contracted with Leidos and/or Plaintiff and Class members were the third-party beneficiaries of contracts between Leidos and Diligent.

140.    Plaintiff and Class members were required to provide their PII to Leidos as a condition of receiving employment provided by Leidos—who then required that the PII be disclosed to Diligent. In other words, Plaintiff and Class members provided their PII to Defendants or their third-party agents in exchange for Leidos' employment.

141.    The contracts entered into by Plaintiff's and Class members' agent (their employer Leidos), were made for the direct benefit of Plaintiff and the Class. Specifically, Plaintiff's and

Class members' third-party agents entered into contracts with Diligent to obtain various software services for the benefit of Plaintiff and Class members.

142.    Plaintiff and Class members (and/or their third-party agent Leidos) reasonably understood that a portion of the funds paid to Diligent would be used to pay for adequate cybersecurity measures.

143.    Similarly, Plaintiff and Class members reasonably understood that a portion of the profits derived from their employment with Leidos would be used to pay for adequate cybersecurity measures.

144.    Plaintiff and Class members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

145.    Plaintiff and the Class members accepted Leidos' offers by disclosing their PII in exchange for employment.

146.    Plaintiff and the Class members (or their third-party agent Leidos) accepted Diligent's offers by disclosing their PII to Diligent in exchange for software-based services.

147.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

148.    In their Privacy Policies, Defendants represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

149.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

150.    After all, Plaintiff and Class members (or their third-party agents) would not have entrusted their PII to Defendants or their third-party agents in the absence of such an agreement with Defendants.

151.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

152.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

153.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

154.    Defendants materially breached the contracts it entered with Plaintiff and Class members (or their third-party agents) by:

   a.    failing to safeguard their information;

   b.    failing to notify them promptly of the intrusion into their computer systems that compromised such information.

   c.    failing to comply with industry standards;

   d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

155.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

156.    Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

157.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

158.    Plaintiff and Class members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

### FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

159.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

160.    Given the relationship between Defendants and Plaintiff and Class members, where Defendants became guardian of Plaintiff's and Class members' PII, Defendants became fiduciaries by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

161.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

162.    Because of the highly sensitive nature of the PII, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendants, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

163.    Defendants breached their fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

164.    Defendants also breached their fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

165.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the California Subclass)**

166.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

167.    The State of California recognizes the tort of invasion of privacy both (1) at common law and (2) under the California constitution.

168.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

169.    Defendants owed a duty to Leidos' current and former employees, including Plaintiff and the Class, to keep this information confidential.

170.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII is highly offensive to a reasonable person.

171.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

172.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

173.    Defendants acted with a knowing state of mind when it permitted the Data Breach because they knew that their information security practices were inadequate.

174.    Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

175.    Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

176.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

177.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

178.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

179.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

180.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

<u>SIXTH CAUSE OF ACTION</u>
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

181.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

182.    This claim is pleaded in the alternative to the breach of implied contract claim.

183.    Plaintiff and Class members (or their third-party agents) conferred a benefit upon Defendants. After all, Leidos benefitted from using their PII to facilitate employment. And Diligent benefited from using their PII to sell and provide services to Leidos.

184.    Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

185.    Plaintiff and Class members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

186.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

187.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

188.    Under principles of equity and good conscience, Leidos should not be permitted to retain the full value of Plaintiff's and Class members' employment because Defendants failed to adequately protect their PII.

189.    Under principles of equity and good conscience, Diligent should not be permitted to retain the full value of Leidos' payment because Diligent failed to adequately protect the PII.

190.    Plaintiff and Class members have no adequate remedy at law.

191.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of their misconduct.

**SEVENTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf of Plaintiff and the California Subclass)**

192.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

193.    Defendants engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

194.    Defendants' conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq.* (the "CCPA"), and other state data security laws.

195.    Defendants stored the PII of Plaintiff and the California Subclass in their computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the California Subclass's PII secure to prevent the loss or misuse of that PII.

196.    Defendants failed to disclose to Plaintiff and the California Subclass that their PII was not secure. However, Plaintiff and the California Subclass were entitled to assume, and did assume, that Defendants had secured their PII. At no time were Plaintiff and the California Subclass on notice that their PII was not secure, which Defendants had a duty to disclose.

197.    Defendants also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the California Subclass's nonencrypted and nonredacted PII.

198.    Had Defendants complied with these requirements, Plaintiff and the California Subclass would not have suffered the damages related to the data breach.

199.    Defendants' conduct was unlawful, in that it violated the CCPA.

200.    Defendants' acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

201.    Defendants' conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

202.    Defendants' conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite their business model of actively collecting PII.

203.    Defendants also engaged in unfair business practices under the "tethering test." Their actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the law.

204.    Instead, Defendants made the PII of Plaintiff and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the California Subclass to an impending risk of identity theft. Additionally, Defendants' conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

205.    As a result of those unlawful and unfair business practices, Plaintiff and the California Subclass suffered an injury-in-fact and have lost money or property.

206.    For one, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

207.    The injuries to Plaintiff and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

208.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the misconduct alleged in this complaint.

209.    Therefore, Plaintiff and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendants; disgorgement of all profits accruing to Defendants because of their unfair and improper business practices; a permanent injunction enjoining Defendants' unlawful and unfair business activities; and any other equitable relief the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

210.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

211.    Defendants violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff and the California Subclass. As a direct and proximate result, Plaintiff's, and the California Subclass's nonencrypted and nonredacted PII was subject to unauthorized access and exfiltration, theft, or disclosure.

212.    Defendants are both a "business" under the meaning of Civil Code § 1798.140 because Defendants are both a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

213.     Plaintiff and California Subclass Members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguards PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continues to hold PII, including Plaintiff's and California Subclass members' PII. Plaintiff and California Subclass members have an interest in ensuring that their PII is reasonably protected, and Defendants have demonstrated a pattern of failing to adequately safeguard this information.

214.     Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendants' registered service agents, detailing the specific provisions of the CCPA that Defendants have violated and continue to violate. If Defendants cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

215.     As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

216.     A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendants.

**NINTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

217.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

218.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

219.    In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

220.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.    Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.    Defendants breached, and continues to breach, their duties by failing to use reasonable measures to the data entrusted to them; and

      d.    Defendants breach of their duties caused—and continues to cause—injuries to Plaintiff and Class members.

221.    The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

222.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

223.    And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

224.    If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

225.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.      Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Date: December 21, 2023

Respectfully submitted,

/s/ James Bilsborrow
James Bilsborrow (JB8204)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, New York 10003
(212) 558-5500
(212) 344-5461 (facsimile)
jbilsborrow@weitzlux.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV*
Andrew E. Mize*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com
amize@stranchlaw.com

*Pro Hac Vice* forthcoming

***Attorneys for Plaintiff and Proposed Class***